

# NUMBER 13-25-00208-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**CHRISTOPHER ALAN YOUNG,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

## ON APPEAL FROM THE 26TH DISTRICT COURT
## OF WILLIAMSON COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Justices Peña, West, and Fonseca**
**Memorandum Opinion by Justice Fonseca**

A jury convicted appellant Christopher Alan Young of theft of property valued over $30,000, but less than $150,000, from an elderly individual, a second-degree felony. *See* TEX. PENAL CODE § 31.03(e)(5), (f)(3)(A). Young pled true to the enhancement paragraph, and the jury sentenced Young to sixty years' imprisonment. *See id.* § 12.42. Young appeals his conviction on the basis that the evidence adduced at trial was insufficient to

support the jury's finding of guilt. We affirm because the evidence was sufficient.[1]

## I.     BACKGROUND

Young was married to Debra Mosier-Young and in early 2022 assisted her and her father, Bruce Morton Mosier, with moving to a residence in Georgetown. Mosier owned an extensive coin collection comprised of many valuable gold and silver coins and various other valuables. In August 2022, while moving some of Mosier's property, Mosier and his family discovered over $128,000 worth of coins were missing.

Suspecting Young, Debra confronted him and later discovered invoices and checks indicating Young sold coins at various coin stores in Texas and beyond, including at D&A Williams, Gold & Coin Mart of Georgetown, Gold & Beyond, and Leshem Diamonds and Gold (Leshem). All of the coins indicated as sold in the documents belonged to Mosier's collection. As a result, Debra and her family reported these thefts to law enforcement in September 2022, leading to Young's arrest.

A grand jury indicted Young of the offense as described above. It also submitted a penalty enhancement paragraph related to Young's prior felony conviction for vehicular homicide – DUI. Trial commenced on March 7, 2025.

### A.     Valeri Reeder

Valeri Reeder, one of Mosier's daughters and Debra's sister, testified that her father Mosier was eighty-six years old and had three daughters. She extensively described Mosier's decades-long coin-collecting hobby. She attested that the entire family

---

[1] This case is before the Court on transfer from the Third Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

was aware of his coin collection and that Mosier never gave the coins to Young or anyone else in the family. Valeri discussed the manner by which Mosier moved the coins to his Georgetown home from his prior home in Colorado in 2018. She said only Debra and Young were with Mosier when he moved the coins to the Georgetown home.

Valeri further testified that by early 2022, it became clear Mosier and her mother needed to move into assisted living. However, Mosier wanted to inventory his coin collection before moving. Valeri clarified on cross-examination that Mosier never inventoried the coins while he lived in Colorado. Valeri and Debra began inventorying in March 2022 by going through boxes, creating a spreadsheet, and taking photos of the coin boxes. The trial court admitted these photos into evidence. They continually updated the spreadsheet throughout the process with more detailed descriptions of the coins. Valeri, Mosier, and Debra were the only ones present during the inventory process. During the inventory, they noticed some coins were already missing based on Mosier's recollection of which coin sets should be complete but were not.

After they finished the inventory, Valeri's husband, Rick Reeder, helped move most of the coin boxes into a storage facility in Georgetown. Valeri, Mosier, and Rick were the only ones with keys to the storage facility. However, some boxes remained at the house in Mosier's office. These boxes included a full set of American Silver Eagle coins, Morgan and Peace Dollars, and other recently received coins. The spreadsheet did not note which coins remained in Mosier's office and which went to the storage facility.

Valeri testified that while the coins were not initially secured, Young suggested that they store the coins in a closet in Mosier's office with a lock. Young eventually purchased and installed the lock for Mosier's closet containing the coins. Valeri claimed there were

3

two keys for the lock and that Mosier stored one key in a dresser drawer in his office. She speculated Young might have had the other key. The only persons with knowledge of the keys were Rick, Young, Debra, and Valeri.

Later in August 2022, as Mosier and his wife prepared to move into assisted living in Round Rock, Mosier decided he wanted the coins moved from the Georgetown storage facility to a unit closer to him in the Round Rock area. Young and Debra were returning from a cruise at that time but went to their home in Pearland before heading to Georgetown to help. Valeri claimed Young and Rick were responsible for moving the coins from Georgetown to Round Rock and did so in a single day. She also testified that the only persons with the access code for the Round Rock facility were Mosier, Young, Rick, and possibly herself. Valeri stated records indicated the Round Rock storage unit was accessed by someone in August 2022.

Valeri testified that during this moving process she noticed several boxes of coins were missing from the closet. She started considering who had access to the coins when Debra asked Young if he took the coins. Young angrily defended himself and left the house. He eventually returned due to a counseling appointment he had with Debra but again screamed at Debra and left.

The next day, Debra called Valeri and sent her three photos of invoices from D&A Williams, a jewelry and precious metals store, for coins Young sold to them. After reviewing the invoices and believing they were evidence that Young stole and sold Mosier's coins, Valeri contacted Georgetown police and reported the alleged crime. The Georgetown police indicated it would be several months before they could investigate. She testified she was worried Young would continue to sell coins in the meantime

4

because, after his counseling appointment with Debra, he left without telling Debra he was coming back.

Valeri then contacted the ex-husband of one of her other sisters who worked in law enforcement. This led to the Texas Department of Public Safety (DPS) assigning Special Agent Nathaniel Head to investigate the case. Valeri provided a lead to Head to investigate Leshem in New Mexico and Gold & Coin Mart in Georgetown. During the investigation, some of the coins were recovered and returned to Mosier. Valeri started compiling a spreadsheet of the stolen coins. She testified as to how many coins were in each set, which coins were missing, and which coins were recovered. She further testified that Head provided updates on invoices located throughout his investigation.

Valeri described the invoices from various coin dealers Young sold coins to, which the trial court admitted into evidence. She also testified regarding many of the sales dates being just a few days after Young stayed at Mosier's home, indicating Young had opportunity to commit the thefts. She described the following invoices from D&A Williams: a May 10, 2022 invoice for the sale of eleven different coins and a coin set totaling $861; a May 26, 2022 invoice for several other coins including foreign coins and currency totaling $4,741; a June 6, 2022 invoice for more coins totaling $7,495; a June 21, 2022 invoice totaling $10,055; and an August 12, 2022 invoice totaling $5,254. She described the following invoices from Gold & Coin Mart in Georgetown: a June 7, 2022 invoice for silver plates and other coins totaling $1,920, and an August 11, 2022 invoice for coins and ingots and currency totaling $1,300. Young's ID card was attached to the Gold & Coin Mart sales. Valeri confirmed all of the coins sold in the invoices matched coins missing from Mosier's collection.

A warrant was issued for Young's arrest, and he was arrested in Louisiana. Following Young's arrest, law enforcement acquired Young's truck. Valeri, Rick, and Debra reviewed the contents of Young's truck after it was returned to Texas. The trial court admitted thirteen photos of the contents displaying many items that Valeri testified belonged to Mosier and his wife. These items included stamps, stamp books, loose coins, coin sets, a fishing magnet, Mosier's military ID, a watch, a lighter, a diamond and sapphire bracelet, a trunk filled with model Texaco trucks, and other "trinket-type things." Valeri claimed all these items would have been in Mosier's office or elsewhere in the home. They did not recover any of Mosier's gold coins. Valeri and the family also later located Young's safe, which contained one of Mosier's pill boxes in which Mosier stored coins as well as a few of Mosier's loose coins. They also located one of Mosier's plastic containers in Young's garage and found more of Mosier's belongings amongst Young's clothing or in Young's closet, kept separately from Debra's closet.

Valeri testified that after logging the stolen coins, the following were still missing: ninety-two gold coins worth $89,863; American Silver Eagle Coin sets from 1986 to 2022 worth $64,371; Morgan Dollar sets from 1878 to 1921 and a 2021 100th anniversary set totaling $57,955; Peace Dollars sets from 1921 to 1935 and a 100th anniversary set totaling $7,697; portions of Commemorative Sets from 1988 to 2022 totaling $6,093; Eisenhower Dollars totaling $34,455; Proof Sets totaling $6,042; Franklin Mint silver ingots, Mint Rounds, Christmas ornaments, and silver plates totaling $2,843; foreign coins and currency worth roughly $600; stamps from 1975 to 2016 totaling $4,804; a watch worth $419; a bracelet worth $2,300; and miscellaneous individual coins worth $450. Several of the coins matched invoices for coins Young sold to D&A Williams and the other

6

dealers. The total estimated worth of all the stolen items logged and from Young's truck was $283,000. Valeri estimated they recovered about $7,000 worth of the coins.

During cross-examination, Valeri conceded several of the checks for the coins sold went into Debra and Young's joint bank account from which only Debra could write checks. Valeri testified that the checks were deposited between May and August. She also admitted her mother's home health care worker had access to the closet but that she would only be present in the house with her mother and was never unattended. She also stated two nephews had access to the house, though not the closet.

### B.    Bruce Mosier

Mosier testified regarding his lifelong hobbies including coin-collecting as well as collecting stamps and foreign currency. He intended for the collection to go to his three daughters after he passed. Mosier stated he never gave any coins to Young or allowed him to borrow the coins. He testified as to the coin inventory being conducted before he moved into assisted living as described by Valeri. Mosier also stated that he told Young about the value of the coins. He never allowed Young to have possession of his military ID, watch, or stamps. On cross-examination, Mosier agreed he never saw Young take any of his belongings and that Young only came to his house with Debra.

### C.    Rick Reeder

Rick testified regarding his relationship with Mosier and his observation that the coin collection was very important to Mosier. Rick claimed Mosier would discuss the coins with anyone he knew. Rick also testified that he first met Young in California and spent time with him in the years thereafter as part of being related by marriage and their wives spending time together. He stated Young had both a good and bad side.

7

Rick corroborated Valeri's account of Mosier and Mosier's wife needing to move into assisted living and the process of moving them. He confirmed Valeri and Debra were the ones primarily cataloging and organizing the coins. He and Young only moved boxes, though checked for coins inside the boxes. Rick stated that Mosier would comment on how many more of a certain coin should be in the collection. Rick confirmed they bought tubs to store the coins after they were organized, and reaffirmed Reeder's testimony on how they were stored in Georgetown first and then moved to Round Rock. Based on Rick's testimony, the trial court admitted photos of the storage unit, the storage tubs, Young and Rick in the parking area, Young and Rick standing next to their truck, and Young and Rick unloading the tubs.

Rick testified that it took several months to move other items and that the family eventually noticed coins were missing. He noted Young's suggestion that the middle sister's teenage sons stole the coins. Eventually, Rick learned Young left Debra and fled Texas. He also testified he traveled to Louisiana to retrieve Young's truck after Young's arrest, catalogued its contents as Valeri testified, and drove it back to Texas. Rick conceded during cross-examination he did not know who put the items in the back of Young's truck, though noted that Young never told him someone else placed the items there. He also admitted his nephews had a criminal history of theft and marijuana use.

### D. Debra Mosier-Young

Debra testified regarding her relationship with Young and how they became married. They bought a home together in Pearland, in which she still lives. She claimed that Young became aware of Mosier's coin collection after helping move Debra's parents to Texas. She described the coin inventory occurring in spring 2022, as Valeri testified,

8

and similarly described Mosier's plans for the coins and that he never gave them to anyone. Debra also testified that it was Young's suggestion to put a lock on the closet where Mosier wound up storing his collection. She believed one key was placed in Mosier's office and that Rick had the other key. She did not think Young knew where Mosier's key was located.

Debra further testified regarding her mom falling as she and Young returned from a cruise vacation in August 2022. She described how they headed to Austin and stayed with her parents for a few days to help and eventually started moving them into assisted living. Debra further corroborated this was when the family discovered Mosier's gold coins were missing. Debra, Young, and Mosier searched around the house for the coins but did not find any.

Debra testified that she then became concerned Young stole the coins because he gambled a large amount of money on their cruise and he had not been working for the three months prior to the cruise. She also described Young depositing a check with money of unknown origin to help cover their mortgage. The trial court admitted the check into evidence. Debra explained the account was in her name, but Young could access it with a debit card.

Debra claimed her suspicions led to her confronting Young on the porch at Mosier's house and asking him if he stole the gold coins. She said he "[b]lew up" and yelled at her and Valeri, before leaving the house. Young returned for a virtual counseling appointment which they had due to ongoing problems in their marriage. They then left together to Pearland.

Debra next discovered that Young's previously described check was from D&A

9

Williams and that D&A Williams was a jewelry store. She visited the store the next day and found what looked like a tub of Mosier's coins. Debra subsequently spoke with the shop owner, who provided three invoices dating back at least six months indicating Young sold batches of coins for money. She sent photos of these invoices to Valeri and her ex-brother-in-law who worked in law enforcement. She also recorded this conversation and provided the audio to law enforcement.

After she returned home from this meeting, she found Young leaving with packed bags, claiming to have found a new job in Dallas. She questioned the truth of his claim leading to an argument. Young refused to allow her to check his truck. Debra accused him of taking her dad's coins as he drove away. She recorded the conversation which the trial court admitted into evidence. Debra testified she attempted to locate Young at a mutual friend's house but could not. She admitted on cross-examination he would commonly leave after arguments between them.

Debra further testified regarding DPS's investigation and discovering other locations where Young sold coins. She recorded conversations with more shop owners and discovered checks deposited into her account from Young's other sales. She attempted to convince Young to turn himself in, though rarely spoke with him after this point. Debra testified, as Rick and Valeri did, that after Young's arrest they obtained his truck and the items within it as described above. Debra again confirmed her dad never gave Young any of the coins or other belongings.

### E.    Danny Stephens

Danny Stepens, owner of Regal Coin & Jewelry (Regal) in Pflugerville, testified regarding his conversation with law enforcement and providing an invoice, which the trial

10

court admitted as evidence. This invoice was dated July 19, 2022, and indicated Young sold multiple types of coins and metal bars to Regal. The trial court also admitted a check from Regal to Young for $4,350 or $4,300.[2]

### F.    Dallas Brasseaux

Dallas Brasseaux, a lieutenant with the Louisiana State Police, testified Head contacted him in September 2022 regarding a warrant for Young's arrest. Brasseaux located and participated in arresting Young two days later at a casino in Lake Charles, Louisiana. After the arrest, they photographed Young's truck and the trial court admitted these photos. The photos depicted items in the back of the truck matching the above descriptions including the coins. He also testified regarding searching Teresa Davis's property for coins and not locating any.

### G.    Teresa Davis

Davis, an old family friend of Young, testified that she saw Young off and on throughout the years. She also testified regarding Young staying with her allegedly because he was working in Lake Charles and could not afford a place to stay. Davis stated Young blamed his wife for maxing out credit cards as the reason he lacked money. Young told her at that time that Mosier gave him some stamps and coins.

On a road trip together, Davis witnessed someone hand Young a piece of paper at a pawnshop and Young commented to her that the man didn't know anything about coins. She also described him carrying a heavy orange knapsack during the entirety of the trip. Davis described that law enforcement eventually contacted her after his visit. Brasseaux eventually came to her property and searched for coins and other collectibles.

---

[2] The record is ambiguous on the exact amount of the check due to a difference in amounts on the check.

As previously described, he did not locate any at her property.

### H.     Nathaniel Head

Head testified regarding his investigation and involvement in the case. He began by individually interviewing witnesses including Valeri, Rick, Debra, and Mosier to gather their independent accounts. Using this information, he then visited the various coin shops including D&A Williams, Gold Coin Mart, and Leshem. He spoke with the owners and obtained invoices matching the ones provided by the family as well as additional invoices. Each invoice confirmed Young had visited and sold coins. Head was able to seize some of the coins Young sold and took photos of them. These photos were admitted into evidence. He also testified regarding DPS's inventory of the stolen coins and other items. Head provided, and the trial court admitted as evidence, emails from some of Young's sales. Emails from Young to Leshem described him as inheriting the coins and looking to sell the inherited coins.

Following his investigation, Head obtained a warrant for Young's arrest in September 2022. He coordinated with Louisiana authorities to locate and arrest Young at a casino in Louisiana. Head reviewed photos of the inventory of Young's truck. He also obtained a warrant for Young's phone and determined he sold coins to Regal Coin & Jewelry, and Gold and Beyond in Las Vegas, Nevada. Head located more invoices and Young's ID card attached to these invoices, which were admitted into evidence.

### I.     Alex Bundy

Alex Bundy, a digital forensic analyst with DPS, testified that he extracted data from Young's phone. He plugged it into a software that extracts phone data and was able to obtain "full-file system extraction" and other data. Bundy placed this data on a hard

12

drive for later review. He conceded on cross-examination he did not know the phone belonged to Young in particular.

### J. Arissa Hendershot

Arissa Hendershot, a digital forensic analyst with DPS, testified she analyzed the data extracted from Young's phone. She verified via the device's serial number that it was the same device for which there was a search warrant. The phone had data for multiple accounts linked to Young. She described texts between Young and various individuals describing the values of various coins and other metals. The data also included Google searches for selling coins.

### K. Scott Gilbert

Scott Gilbert, the owner of Gold & Coin Mart, testified about the nature of his business and how he learned about Young's thefts from Debra. After she came to his shop, he checked his records and remembered the sales with Young. He provided sales records to law enforcement and testified about the various items he purchased from Young. Gilbert valued the items he bought from Young as follows: $65,961 in gold coins, $31,215 in Silver Eagle coins, $27,430 in Morgan Dollars, $5,600 in Peace Dollars, $4,470 in Commemorative Set coins, $353.50 in Eisenhower dollars, $3,923.25 in proof sets, $650 in silver ingots, and other items. The final total was $142,172.50. His valuation was based on May 2022 prices, though he admitted he bought the items from Young at different times, and there could be a "wild difference" in price from month to month. On redirect, Gilbert clarified the valuation was based on prices much lower than when Young sold the coins.

### L.    Mike McAnarney

Mike McAnarney, a DPS lieutenant, testified he was a former spouse of one of Debra's sisters. He remained in contact with the family after the divorce and learned Mosier's coins were stolen. He testified he was aware of the collection since he was married to the family for eighteen years. After learning Georgetown police were too busy to investigate the alleged thefts, McAnarney contacted other DPS officials about the case, leading to Head's assignment to the matter. He did not want to be involved in the investigation because he had personal relationships with Young and Debra. He had no further involvement after Head's initial meeting with the family. Young never told McAnarney that he inherited the coins.

### M.    Amanda Wells

Amanda Wells, Young's sister, testified their deceased parents willed various items to Young including tools, a bag of coins, and some pens. She claimed she could not identify any of the individual coins in the bag. These coins allegedly first belonged to their grandparents, but their parents devised the coins to Young only, despite having three other brothers. The grandparents also never discussed having any coins with her. She admitted on cross that she never told Head during his investigation that Young inherited any coins. She conceded her grandfather passed in 1994 and could not buy coins after, and that her father passed in 2014 and could not buy coins from after that.

### N.    Christopher Young

Young testified about his relationship with Debra. He claimed Debra had gambling and drinking problems and racked up hundreds of dollars in gambling debt. He also described helping Debra's parents move to Texas and learning about Mosier's coin

collection. He claimed he never moved coins to their attic and never opened the boxes. Instead, Young asserted Debra loaded several boxes of Mosier's coins into his truck during the moving process, and he brought them to their home in Pearland, later discovering they contained coins. He testified he never intentionally took boxes with coins and that he sold all of the coins at Debra's direction. Young assumed Mosier gave the coins to Debra.

He also claimed he gave Debra all of the money from the sales. Young further testified he received other coins from his father but could not recall if he sold any of them. He agreed he had bought the lock for Mosier's closet, but that Debra and Mosier were with him when he put the lock on. Young contended he gave both keys to Mosier. He claimed he never opened the closet afterwards and did not steal any coins. On cross, Young conceded the various sale locations and amounts as described above. Young also admitted Mosier did not give him any coins or any other items from his collection and conceded his communications to the various stores that he inherited the items were lies.

On March 12, 2025, the jury found Young guilty of the above-described charge. On March 13, 2026, Young pled true to the penalty paragraph and a sentencing hearing occurred. Following the hearing, the jury sentenced him as described above. This appeal followed.

## II.　ANALYSIS

### A.　Standard of Review & Applicable Law

To determine if a conviction is supported by sufficient evidence, we review "whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014)

15

(quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). "The relevant question 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citing *Jackson*, 443 U.S. at 319). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Edwards v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (quoting *Jackson*, 443 U.S. at 319)).

"[T]he essential elements of a crime 'are defined by the hypothetically correct jury charge' which 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense' the defendant is being accused of." *Lang v. State*, 664 S.W.3d 155, 174 (Tex. Crim. App. 2022) (quoting *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). Here, Young was convicted of theft of property valued over $30,000, but less than $150,000, from an elderly individual. *See* TEX. PENAL CODE § 31.03(e)(5), (f)(3)(A). "The essential elements of theft include the statutory elements as laid out in [Section] 31.03(a) 'as modified by the charging instrument.'" *Lang*, 664 S.W.3d at 174 (quoting *Alfaro-Jimenez*, 577 S.W.3d at 244). "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). "Appropriation of property is unlawful if" taken without the owner's consent. *Id*. § 31.03(b)(1).

**B.    Discussion**

Young's sole argument is that the evidence adduced at trial is insufficient to support his guilt beyond a reasonable doubt. He claims the State's evidence indicated that many other people had access to the stolen items and did not rule out other possible perpetrators of the theft, such as Debra, Reeder, or their nephews. According to Young, these possibilities mean the State failed to prove the essential elements of the crime. *See Lang*, 664 S.W.3d at 174.

However, Young's argument misunderstands the nature of a sufficiency review. The possibility of other culprits does not render the State's evidence supporting Young's conviction insufficient. *See Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Instead, to uphold Young's conviction, we must review the evidence in the light favorable to the State and determine if this evidence allowed the jury to find the essential elements of the theft, as modified by the charging instrument. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174. Thus, we must review and determine if the evidence supported finding that: A) the property was owned by Mosier, B) Young unlawfully appropriated the property, meaning taking it without Mosier's consent, and C) with intent to deprive Mosier of the property. *See* TEX. PENAL CODE § 31.03(a), (b)(1). We also determine if the evidence supports finding Mosier was an elderly individual and the value of the stolen coins was greater than $30,000 but less than $150,000. *See id.* § 31.03(e)(5), (f)(3)(A).

**1.  Age and Property Value**

We address the charging instrument modifications together as Young does not challenge the evidence supporting either finding. There was a plethora of unchallenged evidence indicating Mosier was an elderly individual at the time of the thefts. "'Elderly

17

individual' means a person 65 years of age or older." *Id.* § 22.04(c)(2). Testimony from Valeri, Rick, and Debra all confirmed Mosier's was in his eighties at the time of the crime. There is no doubt a rational jury could find he was an elderly individual as there was no contravening evidence. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174.

Likewise, all record evidence indicates the value of the stolen coins was well above $30,000. Valeri testified regarding various invoices recovered for the stolen and sold coins. The invoices for D&A Williams and Gold & Coin Mart alone indicated a collective value over $31,626 in stolen coins. Reeder also testified that the collective value of all stolen items totaled $283,000. Debra also testified to the various invoices corroborating Reeder's testimony on the value of the stolen and sold items. Stephens, owner of Regal in Pflugerville, testified to verify a sale indicating a value of at least $4,300.

The State also presented evidence of an independent valuation from Gilbert, owner of Gold & Coin Mart. Based on his valuation, he purchased items from Young worth $142,172.50 collectively. Regardless, the jury was entitled to rely on this testimony to determine the value of the stolen property. *Lieber v. State*, 483 S.W.3d 175, 178 (Tex. App.—San Antonio 2015, pet. ref'd). Accordingly, the jury could have determined the stolen property's value fell within the applicable range beyond a reasonable doubt. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174.

### 2. Mosier's Ownership

The State presented overwhelming evidence indicating Mosier's ownership of the stolen property. Mosier testified regarding his extensive collection of coins and other valuables and the decades of effort in accumulating the collection. He verified his daughters inventoried the collection for him, compiling detailed documentation of each

item. This testimony was supported by testimony from Debra, Valeri, Rick, and Young himself regarding awareness that the collection belonged to Mosier. Rick commented how Mosier specifically noted the particular coins in each set during the inventory. Debra and Valeri both testified regarding their inventory of the collection and the way the coins were stored and moved. Rick and Young also testified regarding storage of the coins in various bins and moving those bins to storage in Round Rock.

Head's investigation also corroborated that the items at issue belonged to Mosier. He gathered many of the invoices and worked with the family to match those invoices to coins in Mosier' collection. He testified about retrieving some of the coins and returning them to Mosier. Further, Debra and Valeri testified the invoices for coins and ingots sold by Young to the various coin stores matched the coins that were part of Mosier's collection and missing from his collection. They also testified that many of the belongings recovered from Young's truck were items belonging to Mosier.

The only contradicting testimony was from Wells and Young, both claiming that Young inherited some coins from his parents. However, this testimony did not describe specific coins, and Young conceded most if not all the coins he sold belonged to Mosier. Therefore, viewing the evidence in the light most favorable to the State and deferring to the jury's resolution of the facts, we find there is abundant evidence to determine the stolen items belonged to Mosier beyond a reasonable doubt. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174.

### 3. Unlawful Appropriation

The record is replete with evidence regarding Young unlawfully appropriating Mosier's items, that is, taking the coins and items without Mosier's consent. Mosier

19

testified he never gave any coins to Young, or to any of his daughters; in fact, he never authorized any individual to sell the coins. Yet Young agreed the coins he sold at the various stores were Mosier's property. Young testified Debra gave him the coins to sell and that he never intentionally took boxes with the coins. However, Debra testified she did not take any coins and never gave any coins to Young. Further, Head obtained emails from Young where Young claimed to have inherited the coins.

Valeri testified regarding Young helping move the coins to a secure location and potentially having a key to access the coins as well. She further testified Young had access to the Round Rock storage facility where coins were moved, demonstrating multiple opportunities for Young to unlawfully take the coins. She also testified many of the sales were just a few days after Young visited Mosier's home where coins were located.

While there are competing inferences as to whether Young took the coins without Mosier's consent, we defer to the jury's resolution of these conflicts. *See Edwards*, 635 S.W.3d at 655. We must merely determine if the record evidence supports a finding Young took the items without Mosier's consent if viewing it in the light most favorable to the State. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174. The jury easily could have considered the bounteous testimony regarding Young lacking permission to take the coins, Mosier never giving the coins to any individual, and the resulting sales to make that determination. Accordingly, we find a rational trier of fact could have found Young unlawfully appropriated the items beyond a reasonable doubt. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174.

20

### 4. Intent to Deprive Mosier

"Intent to deprive must be determined from the words and acts of the accused." *Garcia v. State*, 2019 WL 3720634, at *3 (Tex. App.—Texarkana Aug. 8, 2019, no pet.) (mem. op., not designated for publication) (quoting *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. [Panel Op.] 1981)). The record contains a multitude of evidence regarding Young's actions and statements indicating an intent to deprive Mosier of the coins. As previously discussed, multiple witnesses testified regarding Young helping move the coins and thus being aware of where coins were located.

Both Debra and Valeri testified regarding Young getting angry in response to Debra accusing him of taking the coins and leaving. Debra further testified about Young suddenly leaving their home and disappearing, not being found until he was arrested in a different state with Mosier's stolen property in his truck. Young fleeing the state with Mosier's property in his possession after denying having possession is indicative of a lack of intent to return any property. Evidence that Young sold massive quantities of the coins to various stores while claiming to have inherited them is also evidence that Young was lying about where he got the coins and therefore did not obtain them from Debra to sell them, as he claimed in his testimony.

Further, evidence that Young offered alternate culprits of theft of the coins such as nephews can indicate Young's intent was to keep the coins and not return them. Young also never testified he was given all of Mosier's items in his truck bed. Debra offered other testimony regarding Young having money from unexplained sources, which is further evidence indicating Young took and sold the coins without intent to return them. Davis's testimony also supports Young's intent as she stated he told her he inherited items from

21

Mosier and seemingly attempted to sell some on a trip they took together after he left Debra. Hendershot testified that Young's phone data contained texts where Young was attempting to obtain values on coins and Google searches for selling coins.

Therefore, despite Young's testimony that he sold coins at Debra's direction, the jury had plenty of evidence with which to resolve the competing inferences on whether Young's version of events was true or the version supported by the other evidence. *See Edwards*, 635 S.W.3d at 655. Reviewing the evidence in favor of the prosecution, it is plainly demonstrable a rational fact finder could have determined Young intended to deprive Mosier of his property. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174. This element also had sufficient evidence for a jury to find it beyond a reasonable doubt. *See Thornton*, 425 S.W.3d at 303; *Lang*, 664 S.W.3d at 174.

Based on the above, we overrule Young's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
6th day of August, 2026.